# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **FEDEX GROUND PACKAGE SYSTEM, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00656** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **ROUTE CONSULTANT, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Route Consultant, Inc. ("Route Consultant") has filed a Motion to Dismiss (Doc. No. 17), to which FedEx Ground Package System, Inc. ("FedEx" or "FedEx Ground") has filed a Response (Doc. No. 27), and Route Consultant has filed a Reply (Doc. No. 28). For the reasons set out herein, the motion will be granted.

## I. BACKGROUND[1]

### A. FedEx, Its Contractors, and Its Conflict with Route Consultant

FedEx is a well-known shipping company. What may be less well known is the fact that FedEx, by its own account, "does not deliver packages directly." (Doc. No. 1 ¶ 4.) Rather, it "has developed a network of independent corporate business entities throughout the United States and Canada that provide package pickup and delivery services with their own vehicles and their own employees." (*Id.*) These contractors are typically referred to in the shipping field as "independent service providers," or "ISPs." (*Id.*) FedEx estimates that it currently has around 4,500 ISPs in its network. (*Id.*) Each ISP's contract grants it a certain service area, or "route," and the ISP is

---

[1] The facts herein are taken from the Complaint (Doc. No. 1) and are accepted as true for the purposes of the pending motion.

permitted to sell its route to another entity if they can agree on terms. (*Id.* ¶ 5.) The result is that FedEx routes are, as a practical matter, intangible commodities traded on a competitive market and subject to price fluctuation based on the actual or perceived value of each individual route. (*Id.*)

Route Consultant is a consultancy business that serves ISPs, as well as another type of FedEx contractor—"transportation service providers" or "TSPs." (*Id.* ¶¶ 4, 9.) TSPs "provide linehaul services"—that is, the transportation of packages over significant distances, as opposed to the actual delivery of packages performed by ISPs. (*Id.* ¶ 4.) ISPs and TSPs are sometimes collectively referred to as "CSPs," meaning "contracted service providers." Route Consultant holds itself out as offering CSPs (and aspiring CSPs) advice and information regarding "acquisition strategy, business valuations, operations, efficiency, post-close support, [and] compliance review." (*Id.* ¶ 9.) It also "maintains an exclusive portfolio of routes and runs for sale across the United States." (*Id.*) Although Route Consultant does not perform any ISP work on its own behalf, the company's founder and president, Spencer Patton, founded and operates four other companies—Patton Logistics, Inc., Goliath Freight, Inc., Testament Trucking, Inc., and West Iris Transport, Inc.—which were, at the time of the filing of the Complaint in this case, FedEx ISPs. (*Id.* ¶ 7.)

Route Consultant offers various products and packages to CSPs and those hoping to enter the field, including a 12-week course on acquisition strategy that costs about $15,000. Route Consultant also maintains a collection of videos, podcasts, and articles that it bundles together as a program entitled "FedEx Routes for Sale 101." (*Id.* ¶¶ 32–33.) In addition to those educational resources, Route Consultant offers a number of discrete consultancy and support services, such as counseling through the first 90 days after acquiring a route, "dynamic route optimization

2

support packages," and audit compliance assistance. (*Id.* ¶¶ 34–36.) Patton and Route Consultant have also been active in promoting FedEx routes as under-the-radar, but promising, investment assets, even going so far as to describe investing in a FedEx route as "like buying Apple at $1 a share." (*Id.* ¶ 38.)

This case involves a very public—and, FedEx says, manufactured—dispute that arose between FedEx and Route Consultant in July of 2022. According to FedEx, "Patton launched a campaign to promote his Route Consultant business by creating a fictionalized crisis between [FedEx] and its ISPs and TSPs as an advertisement for the purported need for Route Consultant's consultancy and other services." (*Id.* ¶ 11.) He accomplished this through a "series of promotional communications directed toward ISPs and TSPs posted on Route Consultant's website and YouTube channel," in which he "exaggerated and misrepresented the purported financial hardships of the ISPs and TSPs in the current economic conditions." (*Id.*) According to FedEx, "[t]he essence of . . . Patton's campaign [was] that [FedEx's] network of ISPs and TSPs . . . [was] 'in significant peril' and [FedEx] . . . was 'completely tone deaf' and a 'bully' in response to [those] purported financial hardships." (*Id.*) FedEx speculates that Patton's plan was, among other things, to encourage as many ISPs and TSPs as possible to renegotiate their deals with FedEx, so that Route Consultant could then profit off of those renegotiations as a consultant. (*Id.* ¶ 12.) Even if those renegotiations did not occur, however, Patton's videos allegedly raised Route Consultant's profile and fostered the sense that its services were necessary. FedEx also suggests that the videos could have "drive[n] attendance" for an annual conference put on by Route Consultant. (*Id.* ¶¶ 13–17.)

**B. Patton's Initial Communications to the Public Regarding FedEx**

There is, of course, nothing inherently improper about complaining about the economic conditions facing an industry. FedEx alleges, however, that Patton and Route Consultant crossed the line into illegality by making "several false or misleading statements concerning [FedEx's] business." (*Id.* ¶ 18.) FedEx identifies three sets of communications in which, it alleges, Route Consultant made actionable statements regarding FedEx: (1) a publicly posted "Letter of Assurance" from Route Consultant to FedEx, highlighting the hardships faced by FedEx contractors and "demanding certain across-the-board modifications to [FedEx's] agreements with ISPs and TSPs"; (2) "various videos" posted to Route Consultant's YouTube channel making similar points; and (3) a press release reiterating those points under the headline "Route Consultant Founder Spencer Patton Calls for Network-Wide Financial Remedies for FedEx Ground Contracted Service Providers (CSPs)." (*Id.* ¶ 46.)

**1. The Letter of Assurance**

The Complaint does not include the full Letter of Assurance, but Route Consultant has provided a copy, and, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Com. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007) (citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999)). The letter is dated July 20, 2022, "submitted" by Patton, and addressed to two named FedEx executives, as well as the broader "FedEx Ground Leadership Team," although the parties agree that it was posted publicly. (Doc. No. 17-1 at 1.) Patton identifies a "three-fold" purpose of the letter:

1. Establish a strong business case to FedEx Ground for an increase in compensation for CSPs via thoroughly documented analysis. This letter and appendix will prove that contractor costs have changed materially as a result

4

of well-publicized global price increases, and those cost changes are worthy of immediate adjustments from FedEx Ground.

2. Establish a clear timeline for network-wide renegotiation. Prior letters of concern have called for open-ended discussions that ultimately made no progress towards a financial resolution.

3. Encourage FedEx Ground to make a courageous re-assessment of the viability of Sunday delivery. Sunday delivery has been both an incredible struggle and a financial disaster for all parties involved.

(Doc. No. 17-2 at 2.)

The letter devotes a significant amount of attention to establishing the precarious financial state of FedEx contractors, as well as FedEx's role in either contributing to or failing to ameliorate the relevant underlying conditions. Patton alleges that FedEx, "knowingly or unknowingly, has placed the financial viability of CSPs in their Ground network at enormous risk." (*Id.* at 2.) He states that "[n]ot a single day passes without my phone ringing with the story of yet another contractor who is financially collapsing under the weight of these dramatic cost changes that have gone unaddressed by FedEx Ground in 2022." (*Id.*) He notes that FedEx took steps to support its CSPs during the height of the COVID-19 pandemic, but that it had made "no financial adjustment in any capacity" to the even greater challenges associated with 2022 cost conditions. (*Id.*) The letter includes mention of Route Consultant's upcoming "Contractor Expo + Party," which FedEx identifies as evidence of the letter's promotional purpose. (*Id.* at 5.) The letter closes with an appendix purportedly detailing the cost pressures facings CSPs. (*Id.* at 6–18.)

**2. The YouTube Videos**

The Complaint describes three videos uploaded to Route Consultant's YouTube page surrounding the release of the Letter of Assurance. Route Consultant has filed transcripts of the

5

videos (Doc. No. 17-2 to -7), and the court is able to consider those transcripts based on the same principles that permit it to consider the Letter of Assurance.

The first video is thirteen minutes long and titled "FedEx Ground: A Letter of Assurance." The stated purpose of the video is to "request for FedEx Ground to adjust [CSP] compensation across the board." (Doc. No. 1 ¶ 51.) The second video is simply a three-minute-long "truncated version" of the thirteen-minute video. (*Id.* ¶ 52.) The third video, the longest, lasts fifty minutes and was posted under the title "Discussion of the Letter of Assurance to FedEx Ground." (*Id.* ¶ 53.)

### 3. The Press Release

The press release was circulated on July 20, 2022 and, other than links and contact information, reads as follows:

> **Route Consultant Founder Spencer Patton Calls for Network-Wide Financial Remedies for FedEx Ground Contracted Service Providers (CSPs)**
>
> NEWS PROVIDED BY
> **Route Consultant**
> Jul 20, 2022, 13:00 ET
>
> NASHVILLE, Tenn., July 20, 2022 /PRNewswire/ -- In a video appeal and supporting letter Spencer Patton, Founder + President of Route Consultant, urged FedEx Ground to provide substantial financial remedies to its base of 6,000+ Contracted Service Providers (CSPs) by November 25, 2022.
>
> The FedEx Ground pickup & delivery (P&D) and linehaul networks are serviced by contracted logistics companies, and FedEx Ground relies entirely on the service success of these companies for its day-to-day operations. Mr. Patton notes in his letter that the current CSP financial model is collapsing due to substantial increases in the cost of fuel, labor, and vehicles over the past 12 months . . . .
>
> Route Consultant offers consulting services to new and experienced professionals in the logistics community. These services include acquisition strategy, business valuations, operations efficiency, post-close support, compliance review, and more. Finally, Route Consultant maintains an exclusive portfolio of routes and runs for sale across the United States.

6

(Doc. No. 17-8 at 1–2.)

## C. FedEx's Cease and Desist Letter and Route Consultant's Continued Communications

On July 26, 2022, FedEx sent Patton a cease and desist letter. (Doc. No. 1 ¶ 57.) FedEx demanded that Patton confirm in writing that he would take the following steps:

(1) cease all advocacy on behalf of any service providers other than [his own] ISPs; (2) delete the Letter of Assurance, YouTube video and press release from all sites controlled by Mr. Patton; (3) renounce any plans to move forward with an ISP and TSP negotiation committee; (4) refrain from additional public statements regarding the terms of the contracts or business relationships between [FedEx] and the ISPs and TSPs; and (5) stop disparaging the service brand and reputation of FedEx Ground.

(*Id.*) The next day, FedEx sent a letter to all of its ISPs and TSPs addressing Route Consultant's allegations. (*Id.* ¶ 58.)

In response, Patton posted the following message on social media:

For the first time ever, a FedEx Ground CEO sent a public message to 6,000 CSPs targeting a single CSP. His message, calling for us to do the same old "request renegotiation" and "discuss with FedEx" is pretty insulting to all CSPs' intelligence.

I am not afraid of their threats. I have received more than 1,000 messages in 7 days from CSPs—all with a renewed sense of hope and a recognition that they are "all-in" right alongside me. I will lead from the front lines and will never ask anyone to do anything that I won't do myself.

We'll release a formal response shortly—but believe me when I tell you—we have so much momentum from contractors in terminals across the nation. We've all finally had enough of the same old corporate speak.

(*Id.* ¶ 59.)

On August 3, 2022, Patton sent FedEx a response to the cease and desist letter. (*Id.* ¶ 60.) The letter included, among other things, an assurance that Patton would clarify that he does not, and does not intend to, speak on behalf of CSPs other than his own for the purposes of contractual negotiations. (*Id.*) On the same day, however, he posted a new YouTube video

7

entitled "A Follow-Up to our Conversations with FedEx Ground," in which Patton reiterated at least some of his earlier points and raised the possibility of lawsuits on behalf of CSPs that would seek to establish that they legally qualify as franchisees. (*Id.* ¶ 64.) The video included the claim that "we are currently advocating on behalf of FedEx Ground contractors for renegotiations in individual markets." (*Id.* ¶ 65.)

On August 10, 2023, Route Consultant posted another video, purporting to solicit nominations for a 10-member "Trade Association of Logistics Professionals Leadership Committee" to be elected at the upcoming Expo. (*Id.* ¶ 66.) Finally, on August 24, 2022, Route Consultant posted the last YouTube video at issue in this case, entitled "2022 Expo Recap & Initial Address of FedEx Ground TSP Rate Announcement." (*Id.* ¶ 68.)

**D. The Allegedly False Statements**

FedEx identifies ten allegedly false statements from the aforementioned communications that it describes as "false or misleading":

    (a) after referencing the economic changes over the past 12 months, stating "there has been no financial adjustment in any capacity";

    (b) after referencing two letters of concern that an anonymous group of [FedEx] ISPs purportedly wrote earlier in 2022, stating that[,] despite [FedEx's] invitation for conversation[,] "[i]n reality, those conversations did not result in financial adjustments for the CSPs who desperately needed it";

    (c) the "average FedEx Ground business run by a CSP currently operates on profit margins below 0%";

    (d) since the Q4 of 2020, the industry has seen "a 15% pullback on the value of routes because . . . there is more economic uncertainty, you have rising interest rates, you have the stock market that is declined meaningfully";

    (e) "the current CSP financial model is collapsing due to substantial increases in the cost of fuel, labor, and vehicles over the past 12 months";

    (f) pointing to "soaring levels of CSP default rates as evidence of the current financial stress within the network";

(g)  "I am calling for FedEx ground to recognize that its independent contractors are in financial distress";

(h)  "FedEx Ground has not addressed the financial needs of contractors as a result of fuel prices doubling, wage costs going up, and vehicle costs going up"; . . .

(i)  "Almost all of the other contractors that had renegotiation requests were also denied"; [and]

(j)  overstat[ing] the size of [Patton's] businesses by stating, "I have about 225 routes, 275 trucks on the road across 10 different states."[2]

(*Id.* ¶¶ 70, 73 (list consolidated).) The court will refer to the assertions at issue as statements (a) through (j).[3]

FedEx's Complaint does not explain, on an itemized basis, why each individual statement is ostensibly false or misleading. Instead, FedEx has pleaded a few facts that, it asserts, establish the falsity or misleading nature of the statements collectively. Specifically, FedEx alleges that (1) its CSPs "earn average annual revenue of approximately $2.3 million dollars, a figure that has doubled over the last four years," (2) "ISPs have requested mid-contract renegotiations for only about 10% of their agreements in 2022," (3) FedEx "has consented to approximately 40% of renegotiation requests since July 1, 2022, and (5) "over 90% of those renegotiations led to agreement on new terms that resulted in higher contractual payments to the ISPs." (*Id.* ¶ 71.) FedEx also points to (6) a report by a business analyst based on data "for 100 ISP businesses . . .

---

[2] Statement (j) is not included in FedEx's initial list of false or misleading statements, and it does not feature prominently in FedEx's own briefing. The Complaint, however, expressly identifies the statement as false and made in an effort to boost the credibility of the other statements. (Doc. No. 1 ¶ 73.) The court, accordingly, has included it among the statements pleaded as potentially capable of supporting liability.

[3] For reasons unclear to the court, FedEx's Complaint does not expressly identify which statements appeared in which communications. Route Consultant's provision of copies and transcripts, however, provides the necessary context.

for sale on Route Consultant's own website," which concluded that those businesses "generated an operating margin of 16.0%." (*Id.* ¶ 72.)

**E. Reaction and Lawsuit**

Members of the press picked up on Route Consultant's agitations and began reporting on "tension" and a "burgeoning feud" between FedEx and its CSPs, which might, some speculated, even give rise to a contractor-led "revolt" against the shipper. (*Id.* ¶ 90–92.) Some of the coverage suggested that, if the situation continued to deteriorate, it could lead to a slowing of deliveries—a possibility with obvious, serious reputational stakes for FedEx. (*Id.* ¶ 94.) At least one financial analyst cited Route Consultant's statements as evidence of "structural problems" with FedEx's "broken and inefficient" model. (*Id.* ¶ 95.)

On August 26, 2022, FedEx sued Route Consultant in this court. (Doc. No. 1.) In its Complaint, FedEx accuses Route Consultant of using false or misleading statements to manufacture a perceived crisis among CSPs, which would, in turn, have driven worried CSPs to Route Consultant's consultancy services. FedEx states two counts. Count I is for violation of section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), which forbids false advertising or promotion. (*Id.* ¶¶ 98–104.) In support of this count, FedEx alleges that "Patton on behalf of Route Consultant has made false or misleading statements of fact" about FedEx and that FedEx was injured "[a]s a direct and proximate result" of those statements. (*Id.* ¶¶ 99, 104.) Count II is for violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104 & -109. (*Id.* ¶¶ 105–09.) The underlying theory of liability is largely the same: "the false or misleading statements . . . made by . . . Patton on behalf of Route Consultant . . . misrepresented the standard, quality or grade of [FedEx's] commercial activities and/or the services provided" by FedEx, resulting in harm to FedEx. (*Id.* ¶ 108.)

On September 19, 2022, Route Consultant filed a motion to dismiss. (Doc. No. 19.) Route Consultant makes four arguments regarding the Lanham Act claim: (1) the relevant communications were not commercial advertising or promotion and therefore were not actionable; (2) the statements have not been sufficiently pleaded to be false; (3) the statements were not likely to deceive a substantial portion of the intended audience; and (4) there is no causal link between the statements and harm to FedEx. Route Consultant raises similar arguments regarding the TCPA claim, with minor tweaks to reflect the language of that statute.

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[4] *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

---

[4] Because the allegations in this case involve deception, an argument could be made that a higher pleading standard should apply pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *See Ciccio v. SmileDirectClub, LLC*, No. 3:19-CV-00845, 2020 WL 2850146, at *11 (M.D. Tenn. June 2, 2020) (Trauger, J.) (applying Rule 9(b) to false advertising claims). Route Consultant, however, makes no such argument, and this court will follow the ordinary rule that, "[i]f the failure to plead with particularity under Rule 9(b) is not raised in the first responsive pleading or in an early motion, the issue will be deemed waived." *Marathon Petroleum Co., LP v. Future Fuels of Am.*, LLC, No. 10-14068, 2012 WL 1893506, at *2 (E.D. Mich. May 23, 2012) (quoting Moore's Federal Practice–Civil § 9.03[5]).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

### A. "Commercial Advertising or Promotion"

The Lanham Act, 15 U.S.C. § 1051 *et seq.*, forbids certain business practices that Congress has found to fall under the general rubric of "unfair competition." The most prominent such form of unfair competition is trademark infringement, and the Lanham Act both forbids that infringement and creates the federal administrative structure for registering and asserting trademark rights. *See* 15 U.S.C. §§ 1111–21. This case, however, is about a different type of Lanham Act claim, often referred to as "false advertising." *See* 15 U.S.C. § 1125(a). The false advertising provision of the Lanham Act provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . .

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

12

A Lanham Act false advertising claim, unlike many federal causes of action, includes *two* "commerce" elements. First, it contains the common requirement that liability arise from actions taken "in commerce," establishing the Act as rooted in the Constitution's Commerce Clause. *See Am. Fam. Life Ins. Co. v. Hagan*, 266 F. Supp. 2d 682, 694 (N.D. Ohio 2002). However, the statute also imposes a second, more stringent requirement—that the relevant statement be made, not merely in commerce, but "in commercial advertising or promotion." The reason for this additional element—or at least one reason—is that the Lanham Act regulates what a person can say, but the First Amendment of the U.S. Constitution dictates that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const., amend. 1. In order for the Lanham Act to be constitutional, it must limit its scope in some way to avoid running afoul of that prohibition. It does so by "only regulat[ing] commercial speech, which is entitled to reduced protections under the First Amendment."[5] *Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003 (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980)).

The statutory concept of "commercial advertising or promotion," under current caselaw, is inextricably tied to the constitutional concept of "commercial speech." Neither "advertising" nor "promotion" has an express definition either in the Lanham Act or in its legislative history. *See Plateau Cas. Ins. Co. v. Securranty, Inc.*, 608 F. Supp. 3d 566, 569 (M.D. Tenn. 2022) (Crenshaw, C.J.) (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999)). In order to fill that gap, the Sixth Circuit has adopted a definition of

---

[5] Just how "reduced" that protection is has changed over time. "For many years commercial speech was regarded as outside the protection of the Constitution." 2 Smolla & Nimmer on Freedom of Speech § 20:1. The Supreme Court's caselaw has retreated from that absolutist position and now acknowledges that the First Amendment "protects commercial speech from unwarranted governmental regulation," at least to some degree. *Cent. Hudson*, 447 U.S. at 561. The protection afforded to such speech is, however, still generally "lesser" than the protection afforded to "constitutionally guaranteed expression," making the First Amendment easier to comply with. *Id.* at 563.

"commercial advertising or promotion" that expressly includes satisfying the caselaw defining "commercial speech" as one of its elements:

> (1) commercial speech; (2) for the purpose of influencing customers to buy the defendant's goods or services; (3) that is disseminated either widely enough to the relevant purchasing public to constitute advertising or promotion within that industry or to a substantial portion of the plaintiff's or defendant's existing customer or client base.

*Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 801 (6th Cir. 2015).

It is "not always clear" what qualifies as "commercial speech". *Matal v. Tam*, 137 S. Ct. 1744, 1765 (2017). One foundational definition offered by the Supreme Court suggests that "commercial speech" generally refers to "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson*, 447 U.S. at 561 (collecting cases). The limits of that formulation, however, are highlighted by this case. The concept of a commercial utterance relevant only to the speaker and listener makes a certain amount of sense, if one assumes that the speaker and listener are a direct seller and direct buyer of a product or service, forming a closed loop encompassing both the communications made and the underlying economic transactions. Two such parties could hammer their deal out between themselves, and their speech really might be of minimal interest to an outsider. Both FedEx and the CSPs, however, are middlemen. Their services exist between, and in service of, others acting in their own economic interests: sellers and consumers, wholesalers and retailers, suppliers and builders, and so forth. Route Consultant adds even another level of complexity: it is a third-party consultant *to* middlemen. The interrelatedness of the underlying economic system in which the parties take part means that few, if any, communications about an economic transaction will be relevant only to the parties. Someone else almost always has a stake in the matter.

14

If the scope of the interested parties is not alone sufficient to define what is "commercial," then, what else is relevant? The Supreme Court has also looked to "the commonsense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Cent. Hudson*, 447 U.S. at 562 (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455–456 (1978); citing *Bates v. State Bar of Ariz.*, 433 U.S. 350, 381 (1977); Jackson & Jeffries, *Commercial Speech: Economic Due Process and the First Amendment*, 65 Va. L. Rev. 1, 38–39 (1979)). That distinction is relevant, not simply because of the low number of interested parties to such speech, but also because "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017) (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006)). Restrictions on deceptive (or discriminatory, or collusive) commercial speech are permissible because they are, at root, regulations of the business practices enabled by the speech, not the speech in and of itself. As the Supreme Court has explained:

> [R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct. . . . [T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech. That is why a ban on race-based hiring may require employers to remove "White Applicants Only" signs . . . and why antitrust laws can prohibit agreements in restraint of trade.

*Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (internal quotations omitted).

The Supreme Court's more recent caselaw has not applied the historical understanding of commercial speech rigidly, and the Sixth Circuit has followed that lead by holding that "commercial advertising or promotion" in the Lanham Act is not strictly limited to speech

15

proposing transactions. *See Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112 (6th Cir. 1995) ("Although [the article at issue] does more than merely 'propose a commercial transaction' and thus may not meet a core definition of 'commercial speech,' the Supreme Court has extended the category to include speech similar to the article."). Nevertheless, the Sixth Circuit has still looked to the caselaw surrounding that definition for guidance in this area, *see id.*, and the question of whether speech proposes a transaction remains a key "starting point" in the more complex, and less certain, analysis of whether speech is commercial as that concept is currently understood. *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014).

The Lanham Act concepts of "advertising" and "promotion," like the caselaw defining commercial speech, require more than that the speech at issue be, in some broad sense, business-related. Rather, "advertising" and "promotion" refer to specific types of speech bearing the hallmarks of lower constitutional protection, particularly (1) some connection to a real or proposed transaction, such as the future purchase of a good or service, even if the speech itself is not literally "proposing" the transaction, and (2) a focus on conveying information that is relevant to that transaction and the parties to that transaction, such as in a seller's conveying of information about a product to a potential buyer. For example, a trade journal article spelling out scientific facts that happen to reflect favorably on a company's product, without any promotion of the company itself, is unlikely to be commercial speech. But if one fills the same article with endorsements of a particular brand, the speech may be subject to the false advertising provisions of the Lanham Act. *See Semco*, 52 F.3d at 113 (finding commercial advertising or promotion based on that distinction).

Route Consultant argues that its speech was not commercial because it consisted almost entirely of broad, public-facing commentary about business conditions and practices involving

FedEx and its CSPs—not any transaction or proposed transaction involving Route Consultant. FedEx responds that all of that commentary was simply a coordinated promotional campaign, ultimately no less focused on promoting Route Consultant's business than a conventional advertisement would have been. FedEx points out that Route Consultant—like any consultancy business—feeds off the perception of rectifiable (or avoidable) corporate dysfunction. Hyping up that dysfunction—while simultaneously reminding individuals that your services as a consultant are available—is a plausible promotional strategy. *See Grubbs*, 807 F.3d at 800 ("[T]he touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market.") (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002)).

These are serious, important issues, but they are, in this instance, not ones that the court can resolve in connection with Rule 12(b)(6). A fully developed factual record would permit a finder of fact to consider the Letter of Assurance, press release, and videos in the context of a full body of facts regarding the package shipping industry, the media environment among CSPs, Patton's individual stature in and around the industry, and the functions performed by the underlying communications. It may be that some, or all, or none of those communications were commercial speech, as that term is understood in current caselaw. Based on the allegations of the Complaint, however, and with all reasonable inferences drawn in favor of FedEx's position, it is plausible that the communications were, in fact, promotional.

Route Consultant suggests that, even if there is a question about whether aspects of Patton's statements may have been commercial, the court should nevertheless dismiss FedEx's claims because those arguably commercial utterances occurred alongside noncommercial

17

critiques of FedEx that are entitled to a high level of constitutional protection. That line of reasoning, however, has been squarely rejected by the Sixth Circuit and the Supreme Court, which have "made clear that advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech" and that "[a]dvertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Semco*, 52 F.3d at 113 (quoting *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 67 (1983)). A promoter or advertiser cannot render its commercial speech noncommercial just by wrapping it in a candy shell of public interest. The fact that some aspects of Route Direct's critique could have been delivered noncommercially therefore provides no ground for dismissing claims based on the more ambiguous communications that actually did occur.

The court, accordingly, cannot dismiss FedEx's claims on the basis that it has insufficiently pleaded that the underlying speech was commercial and therefore capable of satisfying the definition of "commercial advertising or promotion." Neither of the other elements of the Sixth Circuit's definition of "commercial advertising or promotion" provides a basis for dismissal either—the communications in question were widely circulated, and Route Consultant's commercial purpose has been plausibly alleged (although that purpose is still very much contested as a factual matter). The court, accordingly, will not dismiss FedEx's claims based on its failure to plead commercial advertising or promotion.

**B. Falsity/Tendency to Deceive/Causation**

The Sixth Circuit has held that, in addition to the "commercial advertising or promotion" requirement, a plaintiff who wishes to prevail on a Lanham Act false advertising claim must establish that:

1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999) (citing *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C. Cir. 1990); *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 922 (3d Cir. 1990)); *accord Plateau Cas. Ins. Co.*, 608 F. Supp. 3d at 569. Route Consultant argues that FedEx's allegations fall short of those requirements in multiple ways: the statements have not been pleaded to be actually false or misleading; the statements were not likely to deceive a substantial portion of the intended audience; and there is no plausible causal nexus between the statements and any harm to FedEx. Those issues are distinct, but closely related. The extent to which something is false or misleading bears on how likely it is to deceive, and how likely a statement is to deceive bears on how likely it is to cause harm. The court, accordingly, will consider these issues together.[6]

Before the court can consider whether FedEx has adequately pleaded that any of the underlying statements actually was false or misleading, the court must first consider whether the sentiments conveyed were of the sort even capable of being considered in such terms. Some of

---

[6] In its briefing, FedEx cites prior cases in which this court concluded that the falsity of particular statements could not be decided in connection with a Rule 12(b)(6) motion. (*See* Doc. No. 27 at 17–21.) Although there is, of course, nothing wrong with drawing analogies to prior district court cases, FedEx overreaches by assuming that the outcomes of those specific motions should be read to suggest that this court is under the mistaken impression that considering falsity in connection with Rule 12(b)(6) in *any* case would, for some reason, amount to a "procedural infirmity"—as if federal pleading standards simply did not require the false or misleading nature of a statement to be set forth adequately at all. (Doc. No. 27 at 17.) If anything, though, the opposite is true—Rule 12(b)(6) is more, not less, demanding of assertions that a defendant acted deceptively than it is of other assertions, because, as the court has already noted, such allegations are frequently subject to the heightened pleading standard of Rule 9(b). Although Route Consultant has forfeited its reliance on that heightened standard in connection with the pending motion, that does not relieve FedEx of the obligation to plead falsity at least plausibly and specifically enough to comply with Rule 8.

Patton's statements—for example, statement (c), which makes a quantitative claim about profit margins—include statements of fact that are clearly capable of having been either true or false. Several other of the statements, however, involve much more subjective issues of characterization. "[A] Lanham Act claim must be based upon a statement of fact, not of opinion." *Am. Council*, 185 F.3d at 614 (citing *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995); *Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F. Supp. 115, 136 (D. Mass. 1996)). Although the line between fact and opinion can sometimes blur, a statement will typically be considered an assertion of fact for Lanham Act purposes only if it includes a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000) (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)). Route Consultant argues that many of the statements cited by FedEx cannot satisfy that test.

The court agrees. Several of the statements on which FedEx relies are too vague and too close to opinion to qualify as false or likely to mislead a significant portion of the intended audience. For example, statement (e) is the assertion that "the current CSP financial model is collapsing due to substantial increases in the cost of fuel, labor, and vehicles over the past 12 months." If there had not been increases in those costs over the preceding year, then the statement would arguably be false. But as long as that part was true—and there is no suggestion in the Complaint that it was not—there is nothing else in the statement that goes beyond opinion or prediction. There is no clear division between a company or business model that is "collapsing" under cost increases and one that is merely struggling with them, particularly given that that assessment is at least as much a prediction about the future as a claim about the present.

Even if one thinks that describing the FedEx contractor model as "collapsing" is on the melodramatic side, the Sixth Circuit has rejected the possibility that a company could be liable under the Lanham Act merely for using a "loose, hyperbolic term" to "convey[] an inherently subjective concept." *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 598 (6th Cir. 2013).

The same flaw is fatal to any Lanham Act claim based on statement (f), which merely mentions "soaring levels of CSP default rates as evidence of the current financial stress within the network." "Soaring" is not a clearly defined term, and none of the facts pleaded suggests that it was so inapplicable as to be actually false or misleading. Statement (g) merely claims that CSPs are in "financial distress," which, again, is a matter of characterization that would be difficult to refute and has not, in fact, been refuted in the Complaint. Accordingly, Route Consultant is entitled to dismissal of the Lanham Act false advertising claims insofar as they rely on statements (e), (f), or (g).

Another set of statements—(a), (b), and (h)—involve assertions by Route Consultant that FedEx made no "adjustments" to "address[]" the financial challenges facing CSPs. FedEx argues that these claims were false because CSPs, as a group, were not struggling, and FedEx did, in fact, grant some renegotiation requests, meaning that it is technically untrue that the company did absolutely nothing. As the court has already discussed, characterizing the CSPs as struggling was, based on the facts pleaded, a permissible statement of opinion. Whether FedEx took any steps in response to that fact, in contrast, is a question of fact. In context, however, it is clear that the statements at issue were not intended to suggest that FedEx *never* granted a renegotiation request or *never* improved the terms pursuant to which an individual, struggling CSP did business. Rather, the statements made were about FedEx's failure to adjust its overall model and approach and its failure to adequately remedy the headwinds facing CSPs as a class in the

manner that it had during the height of the pandemic. Nothing in the Complaint suggests that such a characterization was inaccurate. Indeed, FedEx's consistent position has been that there was no need for any such large-scale adjustment in the first place. Route Consultant was simply stating that FedEx had not done something that FedEx itself argues that it had no reason to do.

It is unlikely that any substantial portion of the intended audience of such statements would have been deceived. The targets of Route Consultant's communications—ISPs and TSPs—were sophisticated participants in the industry capable of understanding FedEx's approach, and Patton's own statements acknowledged that FedEx did not have a 100% denial rate for requested renegotiations. *See Am. Council*, 185 F.3d at 616 (finding that the intended audience for certain ambiguous statements was unlikely to be misled because they were "a sophisticated group of professionals who presumably have familiarity with the issues involved").

Moreover, even if one adopts a strict reading of statements (a), (b), and (h) that might render them technically, albeit trivially, false—because it is untrue that FedEx did nothing whatsoever, on any scale or in any instance, in response to cost increases—there has been no plausible account of how those technical errors were capable of harming FedEx. While it is true that, as FedEx notes, literally false statements can be presumed to be deceptive, *see Am. Council*, 185 F.3d at 614, that deception must still be of a material fact and must still actually harm the plaintiff. A hyper-technical reading of a statement that makes it false—but for a minor, unimportant reason—merely changes the basis for finding the statement non-actionable The supposed harm done to FedEx by Route Consultant's statements was, by FedEx's own account, not based on some technical distinction between FedEx's having done *no adjustment* versus its having done *a little bit of adjustment in a few select instances*. Rather, any harm to FedEx appears to have been from the general impression that its contractors were struggling so severely

22

that it posed a risk to FedEx's operations. That premise did not depend on FedEx's having done literally nothing—merely that it did not do enough. The court therefore cannot conclude that FedEx has plausibly alleged that statement (a), (b), or (h) was false or misleading in a way likely to deceive a substantial portion of the intended audience or that the statements resulted in harm to FedEx.

Statement (c) and statement (d) each contains a quantitative assertion that could, in fact, be false. The Complaint, however, never actually pleads that that was the case. The Complaint includes those statements on a list of "false *or* misleading" assertions, but it provides little explanation for why they are there. (Doc. No. 1 ¶ 70.) Moreover, the limited facts that FedEx has pleaded in its ostensible debunking of Route Consultant's claims do not actually refute either statement (c) or statement (d). Statement (c), for example, is about average profit margins, but FedEx tries to rebut it with evidence regarding average revenues. (*See id.* ¶ 71.) Revenue, though, is not the same thing as profit, as FedEx undoubtedly knows. The only information that FedEx has pleaded about margins was based on a sample of 100 ISPs, not on the "average" CSP. (*See id.* ¶ 72.) Statement (d) is addressed even less adequately in the Complaint; the statement makes a quantitative assertion about the "pullback on the value of routes," and FedEx does not appear to have addressed that assertion at all. FedEx has provided facts that might serve as a promising rejoinder, in the open marketplace of ideas, to the general idea that CSPs were as distressed as Route Consultant suggested. It has, however, conspicuously failed to allege that Route Consultant's numbers were actually false or, in any sufficiently explained way, even misleading.

Statement (i) is that "[a]lmost all of the . . . contractors that [made] renegotiation requests were . . . denied." (*Id.* ¶ 70(i).) FedEx purportedly rebuts that statement by asserting that it "has

consented to approximately 40% of renegotiation requests since July 1, 2022." (*Id.* ¶ 73.) As Route Consultant points out, however, the relevant dates do not match. Nothing in Patton's original assertion limited his claim about renegotiation denials to the period starting in July of 2022. To the contrary, the Letter of Assurance itself was released *in* July of 2022, and its copious exhibits make clear that the cost increases being discussed began significantly earlier. (*See* Doc. No. 17-1 at 7–8, 10–11, 13, 15–16.) All that FedEx has pleaded, then, is that a statement that was made at one chronological point would have been false or misleading if it had been made later and with a different time limitation. Statement (i) therefore has not been pleaded to be false or misleading.

The final remaining statement—statement (j), Patton's assertion regarding the size of his own routes—is one that FedEx has, in fact, alleged to be literally false. Although this statement is not really about dysfunction surrounding FedEx at all, it is at least conceivable that a falsehood about Patton's businesses could harm FedEx by lending Patton's, and by extension Route Consultant's, critique more credence than it deserved. The statement itself, however, is explicitly an estimate—it states "about" how many routes and trucks Patton's companies had. (*Id.* ¶ 73.) FedEx, moreover, has not asserted just how overstated those numbers were. Given the comparatively attenuated importance of this fact to FedEx's theory of harm, the overstatement would have to have been quite substantial to have made any plausible difference in the course of events. By failing to plead facts that would permit the court to conclude that Patton was, in fact, inflating his importance so significantly that FedEx could plausibly have been harmed, FedEx has failed to plead a Lanham Act violation based on statement (j).

FedEx, therefore, has failed to allege any statements by Route Connect sufficient to support liability for false advertising under the Lanham Act. The Complaint suggests that the

24

enumerated statements were only some of the false or misleading claims that Route Consultant made, but FedEx had an obligation to plead facts in its Complaint capable of "showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1)(2). An IOU is not sufficient. Route Consultant is therefore entitled to the dismissal of the Lanham Act claims against it.

## C. Tennessee Consumer Protection Act

The TCPA outlaws a list of more than fifty "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(b). Although many of the forbidden practices are industry-specific and targeted at particular hypothetical schemes, the illegal practice at issue with regard to most of the statements mentioned in the Complaint is the much more broadly defined prohibition on "[d]isparaging the goods, services or business of another by false or misleading representations of fact." Tenn. Code Ann. § 47-18-104(b)(8).[7] The TCPA authorizes a private cause of action on behalf of "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice." Tenn. Code Ann. § 47-18-109(a).

"Person," for the purposes of the TCPA, can refer to any "natural person, individual, governmental agency, partnership, corporation, trust, estate, incorporated or unincorporated association, and any other legal or commercial entity however organized." Tenn. Code Ann. § 47-18-103(14). The Tennessee Supreme Court has made clear that, as the statutory language suggests, "it is irrelevant whether a corporation is a 'consumer under the Act because the right of action is given to 'person[s],'" with "consumer" being a separate, defined term used in other

---

[7] Statement (j), which involves an alleged positive mischaracterization of Patton's CSPs in order to bolster his credibility in his criticisms of FedEx, would probably best fit under Tenn. Code Ann. § 47-18-104(a)(5), which forbids "[r]epresenting that goods or services have . . . characteristics . . . or quantities that they do not have."

provisions. *ATS Se., Inc. v. Carrier Corp.*, 18 S.W.3d 626, 629 (Tenn. 2000); see Tenn. Code Ann. § 47-18-103(3) (defining "consumer"). Accordingly, a business, such as FedEx, can sue another business if the plaintiff business was harmed by the defendant business's unfair or deceptive act or practice.

However, the fact that liability in a case such as this must be premised on a "false or misleading representation of fact" causing an "ascertainable loss" means that the court's analysis of those issue under the Lanham Act can double as its analysis under the TCPA. *See La.-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019) (noting overlap between the statutes). Each alleged misstatement on which FedEx relies has some serious defect, as pleaded, that prevents it from supporting liability based on the statement's falsity or misleading nature. The court accordingly will dismiss the TCPA claim as well.

## IV. CONCLUSION

For the foregoing reasons, Route Consultant's Motion to Dismiss (Doc. No. 17) will be granted, and all claims will be dismissed without prejudice to FedEx's right to file a fully supported motion for leave to amend.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

26